NO. 12-4574

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

ROY LANGBORD, DAVID LANGBORD,
and JOAN LANGBORD, Appellants

v.

UNITED STATES OF AMERICA, Appellee

APPEAL FROM JUDGMENT IN FAVOR OF THE UNITED STATES
IN CIVIL NUMBER 06-5315 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PETITION FOR REHEARING EN BANC OF
APPELLEE UNITED STATES OF AMERICA

ZANE DAVID MEMEGER
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

JACQUELINE ROMERO
NANCY RUE
Assistant United States Attorneys

615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
 (215) 861-8568

The United States respectfully requests rehearing en banc of the divided panel decision in this case, which vacated a jury verdict and district court decision, and prevents the government from recovering from the family of a thief exceedingly rare gold pieces that were stolen from the United States Mint in the 1930s. It is the belief of government counsel, based on a reasoned and studied professional judgment, that the decision is contrary to unanimous authority regarding the property interests of the United States as well as the operation of forfeiture laws. Moreover, this appeal involves questions of exceptional importance: The majority opinion produces a miscarriage of justice in this particular case, and more broadly it also significantly misreads civil forfeiture statutes in a manner that does substantial harm to the ability of the United States to protect its own property and to pursue forfeiture under applicable law.

This case concerns 10 gold pieces minted in 1933 as "Double Eagle" $20 coins, but never issued by the United States as coinage. Upon taking office in 1933 at a time of financial crisis, President Roosevelt ordered a halt to the issuance of gold coins and directed that the 445,500 1933-dated Double Eagles that had recently been minted in Philadelphia not be issued. In 1937, the coins were melted, with the exception of two that were sent to the Smithsonian Institution. The Double Eagle, long considered one of the most beautiful of American coins, was never minted again.

However, some 1933 coins survived. They were stolen from the Mint by its cashier, George McCann, abetted by Israel Switt, a Philadelphia merchant and coin dealer, who over time sold some at a significant premium while hoarding the rest. As the decades passed, the United States never relented in its effort to recover this stolen

government property, successfully retrieving several.[1]

      In 2001, a unique deal was reached concerning one of the coins that Switt sold. The government had mistakenly issued an export license in 1944 allowing that coin to leave the United States, after it was acquired by the King of Egypt. For that reason, after this coin was recovered from an American collector in 1996 and litigation ensued, the government decided to settle the matter. The parties stipulated that the Double Eagle was property of the United States Mint; and the Mint agreed to monetize that one coin (accepting a payment of $20) and to sell it at auction, with the government and the collector splitting the proceeds. The coin sold at auction in 2002 for $7,590,020, almost twice the greatest sum ever paid at auction for any coin.

      Shortly after the 2002 sale of that one coin, Joan Langbord, the daughter of the late thief Israel Switt, announced that she discovered 10 more 1933 Double Eagles in her safe deposit box, and she wanted the same deal that the collector had just enjoyed. The Langbord family, purporting to reserve all rights, surrendered the coins to the Mint for authentication. The Mint retained the coins after authenticating them, given that they are and always have been government property. The Langbords subsequently sent the Mint a "seized asset claim," demanding that the government seek judicial forfeiture. The government declined to seek forfeiture, however, observing that forfeiture – which *transfers* title to the government – was unnecessary,

---

[1] In an unsupported, unexplained statement, the panel majority said, "Switt's involvement in this scheme was never proven." Maj. Op. 6. However, the government did prove that Switt was responsible, as the district court recognized in its detailed opinions. On appeal, the appellants never challenged this conclusion. The majority also suggested without deciding that some impermissible hearsay was introduced at trial. *Id.* at 10 n.5. That is incorrect, and also irrelevant; as Judge Sloviter explained, the verdicts rested on abundant independent evidence. Diss. Op. 19.

given that the government *retains* title to property that has been stolen from it.

In this ensuing litigation, the district court agreed that the government was not required to commence a forfeiture proceeding under the Civil Asset Forfeiture Reform Act (CAFRA), but held that the government should have afforded more process once the Langbords demanded the return of the coins. As a remedy, the court directed the government to present a judicial forfeiture claim, thus shifting the burden of proof to the government. The government then filed a complaint seeking judicial forfeiture, and also requesting a declaratory judgment to quiet title to the coins.

A two-week trial followed, during which the government proved that the coins were stolen from the Mint. The unanimous jury returned a verdict for the government on the forfeiture claim, and the district judge entered a declaratory judgment decreeing that the Double Eagles were not lawfully removed from the Mint and, as a matter of law, remained the property of the United States, regardless of the applicability of CAFRA. The district court issued lengthy and meticulously detailed opinions in support of its rulings.

Now, a sharply divided panel of this Court has vacated the jury's verdict and all of these rulings, holding that CAFRA strips the government of its right to defend title to its property because a judicial forfeiture action was not filed within 90 days of receiving the Langbords' self-styled seized asset claim. The family of a thief now stands to benefit in the millions of dollars on the basis of property that belongs to the people of the United States – a status the majority never disputes.

1. There are numerous errors in the majority opinion that result in this miscarriage of justice. At the outset, one must be highlighted. The majority

fundamentally erred in not recognizing that the government acted in this case not as law enforcer, but as a property owner. Almost all of the majority opinion is dedicated to the (erroneous) conclusion that the government was required to comply with CAFRA's timing provisions for a nonjudicial forfeiture and that it lost its claim by not filing a forfeiture action within 90 days of the Langbords' seized asset claim. Even assuming that the majority's interpretation of CAFRA is correct (and it is not, as we explain later), the vacatur of the declaratory judgment is unsupportable because that judgment rested on the government's entirely separate claim as *owner* of the coins.

The majority stated, "There is no dispute that the Government acted 'under a civil forfeiture statute.'" Maj. Op. 20 n.11. That is indeed disputed, and rightly so. The Mint did not act to forfeit the coins, because the coins were stolen government property. The very purpose of forfeiture is to transfer title to the United States. 18 U.S.C. § 981(f). There was no reason to accomplish that here; the government asserted and ultimately proved that it always had title to the coins. When the government finds and recovers actual property stolen from it (as opposed to proceeds), it does not "forfeit" it. It instead acts to recover it.

The majority's error is best illustrated through a hypothetical. Presume that a valuable coin was stolen not from the Mint, but from the United States mail, having been sent from one private museum to another. A law enforcement agency, upon solving the case and recovering the coin, may act under CAFRA to forfeit it. *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7) (listing theft of mail in violation of § 1708 as a predicate for civil forfeiture). Presume further that the government makes some procedural mistake and loses the forfeiture claim. At that point, the government may

not forfeit the coin, *but it cannot be questioned that the private owner of the stolen coin retains all rights to a civil action against the thief for the return of the property.*

The United States in the present matter is an owner of stolen property. Nothing in CAFRA states that, with regard to property of the United States, if CAFRA allows for the forfeiture of such property then forfeiture becomes the government's *only* remedy to recover its property – in other words, giving the government fewer rights with regard to its own property than any other entity or individual in the world has with respect to property located in the United States. The Constitution itself, in the Property Clause, Art. IV, § 3, Cl. 2, states that nothing in the Constitution may be read to compromise the interest of the United States in its own property. And there is nothing in CAFRA, either explicit or implicit, that limits the government to a forfeiture remedy with regard to the government's own stolen property. To the contrary, CAFRA merely provides that if the government fails to file a judicial forfeiture action within 90 days after receiving a seized asset claim, the government "*may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.*" 18 U.S.C. § 983(a)(3)(B). The statute says nothing about any other remedy the government might have in a case where the government's *own property* is at issue.[2]

The government holds vast property in trust for the people. Numerous doctrines therefore provide that the government cannot inadvertently or through negligence lose title to its property. *See, e.g., United States v. California,* 332 U.S. 19,

---

[2] Presumably, the majority's ruling does not apply to property lost or misplaced by the government, given that forfeiture is not available for such property. Thus, we would be left with the bizarre result that the government has fewer rights with regard to stolen property than with regard to property it merely misplaced.

39-40 (1947) ("officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act"); *United States v. Steinmetz*, 973 F.2d 212 (3d Cir. 1992) (affirming government title to a Confederate warship sunk 126 years earlier). Surely, by enacting CAFRA, Congress did not abrogate these fundamental principles in the case of property stolen from the United States, and impose an unyielding 90-day limit on government action in such cases, without any express or even implied statement to that effect. It certainly did not do so in a statute which is principally addressed to recovery by the United States of *others'* property used or obtained by others in myriad specified unlawful activities.[3]

Under the law, a thief never gains good title to property, nor does an innocent third party who acquires from the thief; stolen property remains titled in its original owner. *See, e.g., Linwood Harvestore, Inc. v. Cannon,* 235 A.2d 377, 380 (Pa. 1967). The majority opinion in this case fundamentally errs, upon finding a violation of CAFRA, in depriving the government of its separate declaratory judgment in which the district judge, relying on the findings of a unanimous jury, determined that the 1933 Double Eagles were in fact stolen and remained the property of the United States regardless of the availability of a forfeiture remedy.

---

[3] In its various subsections and through cross-references to other statutes, 18 U.S.C. § 981 permits civil forfeiture based on the violation not just of 18 U.S.C. § 641 (theft of government property), but over 200 other federal statutes as well. It is untenable to assert that Congress meant in this fashion to specifically and severely restrict the government's remedies in recovering property stolen from it. And there was very good reason to include stolen government property in the forfeiture provision, even if the government has other remedies to recover the res itself. The provision allows not only recovery of the property, but of *proceeds* of the property (for example if it were sold) which the government otherwise cannot reach without a forfeiture action.

Under the Declaratory Judgment Act, "any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The majority offered two reasons for depriving the United States of a declaratory judgment as to its own property. First, the majority stated that a declaratory judgment action could not "be used to circumvent CAFRA's 90-day deadline." Maj. Op. 31. But the majority erroneously believed that the declaratory judgment rested on the same cause of action as the forfeiture claim. That was clear error. The declaratory judgment action was in the nature of a quiet title claim which any property owner may bring without needing to show that the property was subject to forfeiture. By imposing CAFRA's extraordinarily short limitations period on the government's ability to quiet title to its stolen property, the opinion singles the government out from all other property owners for uniquely disfavorable treatment, without any statutory basis and in contravention of many jurisprudential principles regarding government rights.[4]

Second, the majority reversed the government's declaratory judgment on the ground that CAFRA constitutes a "special statutory proceeding" that displaces declaratory relief, within the meaning of an advisory committee note to Federal Rule

---

[4]  For instance, there is a fundamental rule that a statute of limitations will never run against the government unless Congress expressly so provides, and even then, "[s]tatutes of limitation sought to be applied to bar rights of the government, must receive a strict construction in favor of the government." *E. I. Du Pont De Nemours v. Davis*, 264 U.S. 456, 462 (1924). *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 95-96 (2006). For similar reasons, the doctrine of sovereign immunity bars any action to divest the government of property rights absent an unequivocal statutory waiver of such immunity. *See Department of Army v. Blue Fox, Inc.*, 525 U.S. 525 U.S. 55 (1999).

of Civil Procedure 57. While Rule 57 itself provides that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," the advisory committee note indicates that declaratory relief should not be applied "if a special statutory scheme has been provided for the adjudication of some special type of case." The majority then reaches the conclusion that civil forfeiture is such a "special statutory scheme."

The majority's conclusion that CAFRA constitutes a "special statutory scheme" that preempts the government's right to declaratory relief with regard to its own property is unprecedented and erroneous.[5] Congress never stated that CAFRA displaces all other remedies, particularly those remedies the government has when it is seeking to recover its own property. In fact, CAFRA explicitly says otherwise, limiting the consequence of a failure to comply as precluding further civil forfeiture proceedings, and nothing else. *See* Diss. Op. 25 (explaining that the declaratory action here seeks a broader remedy than the forfeiture proceeding alone entails). This Court has previously made clear that forfeiture need not be pursued where another basis for retention of property exists. *Mantilla v. United States*, 302 F.3d 182, 187 (3d Cir. 2002). Because the majority's opinion conflicts with the prior decision in *Mantilla*

---

[5] As the Second Circuit has noted, "since the enactment of the Declaratory Judgment Act, only a handful of categories of cases have been recognized as 'special statutory proceedings' for purposes of the Advisory Committee's Note." *New York Times Co. v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006). The committee note itself states that "general ordinary or extraordinary remedies, whether regulated by statute or not, are not deemed special statutory proceedings." And even on the rare occasion when a special statutory proceeding does exist, a court still has discretion to permit the declaratory remedy. *See Katzenbach v. McLung*, 379 U.S. 294 (1964) (finding Title II of the Civil Rights Act of 1964 to be a "special statutory proceeding," but determining to proceed with declaratory relief because of, inter alia, the importance of rendering a decision).

and with CAFRA's plain text, rehearing is warranted.

If left to stand, the majority's conclusion will have profound consequences, limiting the government in matters involving stolen property – even the greatest national treasures – to the strict and narrow time limits of CAFRA. Those restrictions are placed on no other property owner when taking action against a thief or, as here, against those who claim to have inherited stolen property from a thief. This result must be vacated, and the declaratory judgment restored.

2. The majority's error with regard to the forfeiture ruling, which comprises the bulk of its opinion, is no less significant. The historical power of the government to forfeit property used in or obtained through illegal activity provides an important means of deterring and remedying misconduct. The majority misreads the applicable statutes and rewrites an important part of the forfeiture laws in a manner that will disturb long-settled and congressionally approved procedures in countless cases.

The applicable statute in this case, 18 U.S.C. § 981, permits civil forfeiture of property involved in violations of over 200 federal statutes, including theft of government property in violation of 18 U.S.C. § 641. Section 981(d) provides that the customs laws, at 19 U.S.C. § 1602 et seq., govern forfeiture proceedings to the extent not inconsistent with the provisions of Title 18. The customs laws allow two types of forfeiture proceedings: administrative (nonjudicial) and judicial. An administrative forfeiture may occur only if uncontested, and only with regard to certain types of property. Under 19 U.S.C. § 1610, if administrative forfeiture is not allowed, the government may only proceed through a judicial forfeiture action.

When the government may seek administrative forfeiture for property covered

in 18 U.S.C. § 981 and chooses to do so, the procedural rules appear in 18 U.S.C. § 983. Section 983(a)(1) gives the time within which an agency must provide notice to people who may have an interest in the property. Next, Section 983(a)(2) allows "[a]ny person claiming property seized in a nonjudicial civil forfeiture proceeding" to file a claim after receiving notice. Finally, Section 983(a)(3) requires the government to terminate the administrative forfeiture in response to a claim and commence a judicial action within 90 days, absent an extension based on good cause. Here, the Langbords sought return of the coins and the government did not file a judicial action within 90 days. On that basis alone, the majority holds that the stolen coins must be returned to the family of the thief. This ruling is wrong for numerous reasons.

The principal errors in the majority's interpretation of CAFRA are (a) its view that "a 'nonjudicial civil forfeiture proceeding' commences when the Government has seized property," Maj. Op. 22, and (b) its determination that the presentation of a claim under Section 983(a)(2) is independent of the government's presentation of notice of a nonjudicial forfeiture, *id.* at 19. Both of these views are unprecedented, inconsistent with judicial authority, and unmoored from the statutory scheme.

First, as a matter of law, *not every seizure commences a nonjudicial (administrative) forfeiture.*[6] Indeed, several categories of property (like real property)

---

[6] For instance, the government often seizes evidence for use in a criminal investigation, without any intention to forfeit. Yet the majority's opinion may be read to allow any criminal suspect, upon the seizure of evidence, to compel a forfeiture action on his own by filing a seized asset claim, creating mischief and untold burdens on the government and the courts. The majority cited the leading treatise, Stefan D. Cassella, Asset Forfeiture Law in the United States 10 (2d ed. 2013), for the proposition that any seizure initiates a nonjudicial civil forfeiture proceeding. *See* Maj. Op. 19. In fact, the Cassella treatise makes no such statement. While carefully distinguishing between administrative and judicial forfeiture proceedings, it merely

are not subject to administrative forfeiture at all. Under 19 U.S.C. § 1610, nonjudicial forfeiture is permitted *only* when the property falls within the description set forth in Section 1607. The government thus does not create a "nonjudicial civil forfeiture" just by seizing property, nor may a claimant initiate a nonjudicial civil forfeiture by filing a claim seeking return of the property.

In this case, *there was not and never could be a nonjudicial civil forfeiture proceeding.* Section 1607(a) allows administrative forfeiture, with immaterial exceptions, only where the property at issue is worth less than $500,000. Here, the parties agreed that the gold pieces were worth many millions of dollars.[7] Thus, even if the government was required to forfeit its own property, it could only do so in a judicial action, and the time limits stated in Section 983(a)(3) for converting a nonjudicial action into a judicial action were inapplicable. Rather, the statute of limitations in 19 U.S.C. § 1621 applied, and the government ultimately filed a judicial forfeiture action within that much longer limit.[8] By treating *every* seizure as a nonjudicial forfeiture, thereby allowing any claimant to file a claim under Section 983(a)(2) and force a far shorter deadline for a judicial forfeiture action, the majority's unprecedented decision rewrites the statutes.

---

states that an administrative forfeiture begins when permitted with seizure *and* the provision of notice.

[7]  In addition, the Mint itself is not a law enforcement agency, and had no statutory authority to initiate a forfeiture claim. And the gold pieces also are not a "monetary instrument within the meaning of section 5312(a)(3) of title 31," § 1607(a)(4), which may be subject to administrative forfeiture, as they were never issued as money and are not in circulation.

[8]  Section 1621 provides that the statute of limitations for a judicial claim is five years after the time when the offense was discovered, or two years after the time when the involvement of the property in the offense was discovered, whichever is longer.

Second, even where an administrative forfeiture is permitted, *the government is not required to undertake it*. The nonjudicial procedure is beneficial in its speed, but discretionary. The government may (and often does) forego the procedure, electing to seek a judicial forfeiture instead, for example where the required notice initiating an administrative forfeiture might jeopardize an ongoing investigation, or even witnesses' lives. On a daily basis, the government abides by the careful statutory scheme in deciding whether to pursue administrative or judicial forfeiture.

And the statute gives the government a reasonable period of time to make this decision, which the majority opinion simply cancels. Section 983(a)(1) allows the agency up to 90 days after a seizure to provide notice if it intends to pursue an administrative forfeiture, with unlimited extensions upon judicial approval. If the government fails to give appropriate notice, it loses the right to administrative forfeiture, *while the right to a later judicial forfeiture action remains.*

In holding that every seizure initiates an administrative forfeiture, and that any claimant can short-circuit the notice period by immediately filing a claim, the majority erases the period afforded by Congress for the government to determine whether and how to seek forfeiture. That view is contradicted by the express statutory language. Section 983(a)(2)(B) – which the majority did not address – contemplates that a seized asset claim will not be filed until notice is provided, stating that the claim "may be filed not later than the deadline set forth in a personal notice letter" or, "if that letter is not received, * * * not later than 30 days after the date of final publication of notice of seizure." *See United States v. $200,255 in U.S. Currency*, 2006 WL 1687774, *5 (M.D. Ga. 2006); 146 Cong. Rec. H2040, H2051 (daily ed. Apr.

11, 2000) (statement of Rep. Hyde, CAFRA's sponsor, that an administrative forfeiture begins when the government gives notice, not upon a seizure).[9]

Congress, for valid reasons, gave the government a choice where certain property is involved (though not the property at issue in this case) – seek administrative forfeiture within a relatively short time, with the knowledge that any claimant might then seek to immediately move to the judicial system and compel the government to make its case; or forego the possible benefit of administrative forfeiture and take advantage of the longer, ordinary statute of limitations for judicial forfeiture. The majority opinion eradicates this careful balance.[10]

Instead, the majority treats every seizure as a nonjudicial forfeiture, even where, as here, nonjudicial forfeiture was *not* authorized by law. It then allows any claimant to abrogate both the notice period for nonjudicial forfeiture and the longer

---

[9]  Consider, for instance, the discovery in an airport of $500,000 in cash in a suitcase, without any knowledge of who or what is involved, which the government needs time to determine. In this common situation, the government uses the notice period to investigate and determine the proper course (including, at times, simply returning the property to a rightful owner). The majority opinion allows a claimant to stop this statutory process in its tracks.

[10]  To be clear, the government has never asserted that it has the power, upon seizing property, to bar any challenge to its possession. A claimant always has a right to be heard. Civil remedies such as replevin are available. Also, in *United States v. 608 Taylor Ave.,* 584 F.2d 1297 (3d Cir. 1978), this Court held that the government may seize evidence pursuant to a search warrant and hold it pending criminal proceedings, but only for a reasonable time, and a claimant may present a motion under Federal Rule of Criminal Procedure 41 to test the "reasonableness" of the retention in the particular case. This doctrine as well is fatally undermined by the majority's novel rule that any seizure initiates an administrative forfeiture and can lead to an immediate demand for a judicial forfeiture action. The simple fact is that the government seizes property for a variety of purposes, and often is able to determine only after investigation the appropriate process to apply and the appropriate persons to notify. The majority decision here upends long-accepted processes, starting with the government's right to choose between administrative and judicial forfeiture, without any basis in statutory or case law.

statute of limitations for judicial forfeiture by immediately sending a "seized asset claim" which compels the government to file suit within 90 days – a fraction of the time otherwise permitted by statute. This ruling ignores that not every seizure starts a forfeiture; not every forfeiture may be nonjudicial; and even where nonjudicial forfeiture is allowed the government is afforded a period of time to decide whether to seek it, and may decide to forego it completely. It is hard to overstate the extent to which the majority's ruling would rewrite the rules consistently followed by the government and the courts, in a manner at odds with the pertinent statutes and Congressional intent.

Here, the government did not and could not seek administrative forfeiture, and therefore the Langbords' request for return of the Double Eagles did not trigger Section 983(a)(3)'s 90-day deadline for filing a judicial forfeiture action. To the extent forfeiture was required (and it was not), the government filed a timely judicial claim at the district court's direction and the jury ruled in its favor. The majority's ruling – that the government lost the right to the coins because it initiated an administrative forfeiture merely by seizing property, and then had to file a judicial forfeiture action within 90 days of the putative claimants' demand – is untenable and leads to an unjust result. As significantly, the panel majority's novel construction of the statute threatens to throw the government's federal civil forfeiture program – a longstanding, nationwide, law enforcement program – into procedural chaos while, at the same time, unduly limiting the prudent exercise of government discretion deciding whether to pursue civil forfeiture of property that it has taken into custody.

3. <u>Conclusion</u>. The Langbords suffered no harm at all, having received exactly the procedural protection they sought – a judicial proceeding in which the government bore the burden of proof. Yet now, after a jury has unanimously found that the coins were stolen from the Mint, the Langbords stand poised for a staggering windfall based on their ancestor's crime, at great harm to the United States. Such an incongruous result is not permitted by the law. The Langbords should not receive the gold pieces that their ancestor stole and hid, and profit by millions of dollars, on property stolen from the United States government. The government should not be limited only to a forfeiture remedy with regard to recovery of its own property. And the civil forfeiture statute should not be interpreted in a manner that contradicts its plain language and entirely disrupts the Congressional scheme in an untold number of cases, at odds with plain statutory and unanimous judicial authority. The panel majority's erroneous decision should be reconsidered and reversed, with title to the stolen pieces confirmed in their rightful owner, the people of the United States.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
JACQUELINE C. ROMERO
NANCY RUE
Assistant United States Attorneys

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4574
_____

ROY LANGBORD; DAVID LANGBORD; JOAN
LANGBORD


v.


UNITED STATES DEPARTMENT OF THE TREASURY;
UNITED STATES BUREAU OF THE MINT; SECRETARY
OF THE UNITED STATES DEPARTMENT OF THE
TREASURY; ACTING GENERAL COUNSEL OF THE
UNITED STATES DEPARTMENT OF THE TREASURY;
DIRECTOR OF THE UNITED STATES MINT; CHIEF
COUNSEL UNITED STATES MINT; DEPUTY
DIRECTOR OF THE UNITED STATES MINT; JOHN DOE
NOS. 1 TO 10 "JOHN DOE" BEING FICTIONAL FIRST
AND LAST NAMES; UNITED STATES OF AMERICA


_____


UNITED STATES OF AMERICA

*Third Party Plaintiff*

v.

TEN 1933 DOUBLE EAGLE GOLD PIECES; ROY
LANGBORD; DAVID LANGBORD; JOAN LANGBORD

*Third Party Defendants*

ROY LANGBORD, DAVID LANGBORD, JOAN
LANGBORD

*Appellants*

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:06-cv-05315)
District Judge:  Honorable Legrome D. Davis

_____

Argued: November 19, 2014

Before:   MCKEE, *Chief Judge*, RENDELL, SLOVITER,
*Circuit Judges*.

(Opinion Filed: April 17, 2015)


Barry H. Berke, Esq.  [Argued]
Eric A. Tirschwell, Esq.
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Kevin J. Kotch, Esq.
Walter M. Phillips, Jr., Esq.
Obermayer, Rebmann, Maxwell & Hippel
1617 John F. Kennedy Boulevard
One Penn Center, 19th Floor
Philadelphia, PA  19103

*Attorneys for Appellants*

Jacqueline C. Romero, Esq.
Nancy Rue, Esq.
Robert A. Zauzmer, Esq. [Argued]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

*Attorneys for Appellees*

_____

O P I N I O N

_____

**RENDELL**, <u>Circuit Judge:</u>

Congress passed the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202, as a "react[ion] to public outcry over the government's too-zealous pursuit of civil and criminal forfeiture" and as an "effort to deter government overreaching." *United States v. Khan*, 497 F.3d 204, 208 (2d Cir. 2007).[1] To that end, Congress crafted a statutory scheme that requires the Government, if it has seized property that someone else purports to own, to file a complaint for judicial forfeiture within 90 days of receipt of a claim (known as a "seized asset claim") or else to return the property. 18 U.S.C. § 983(a)(3)(A). CAFRA also imposes on the Government a heightened burden of proof to establish its right to the property in such proceedings. *United States v. Sum of $185,336.07 U.S. Currency*, 731 F.3d 189, 196 (2d Cir. 2013).

Here, the Government failed to follow CAFRA's procedure, which requires it to file a complaint for judicial forfeiture within 90 days of the filing of a seized asset claim. Accordingly, we will reverse the portion of the District

_____

[1] *See also* H.R. Rep. No. 106-192, at 10 (1999) ("Civil asset forfeiture does not just impact civil liberties and property rights. It can work at total cross purposes with the few professed public policy goals of the federal government.").

Court's July 29, 2009 order denying the appellants' cross-motion for partial summary judgment concerning the applicability of CAFRA. We will vacate all orders at issue on appeal that postdate the July 29, 2009 order, including the jury verdict and the District Court's order entering judgment. Further, we will remand for the District Court and instruct it to grant the appellants the relief required by this Opinion.

## I. Background

The ownership of the property in question and how the appellants obtained possession of it are hotly disputed, but the facts relevant to the disposition of this appeal are not. The property consists of ten coins that were minted in 1933. Each coin is a double eagle, which is a $20 gold coin. The 1933 double eagle is alleged to be "the most valuable ounce of gold in the world" and "America's most beautiful coin." (J.A. 609.) There were 445,500 double eagles minted in 1933; however, those coins were generally not released into circulation. Instead, in an effort to halt the banking crisis during the Great Depression, President Franklin D. Roosevelt issued an executive order in 1933 removing gold coins from circulation. *See* Exec. Order No. 6102 (Apr. 5, 1933).[2] The U.S. Mint ("Mint") was forbidden from releasing any more gold coins, and, over the next few years, began melting the coins into gold bricks. Nonetheless, a number of 1933 double

---

[2] Executive Order 6102 allowed people to continue to possess "[g]old coin and gold certificates in an amount not exceeding in the aggregate $100 belonging to any one person," as well as "gold coins having a recognized special value to collectors of rare and unusual coins." Exec. Order No. 6102, at § 2(b) (Apr. 5, 1933).

eagles left the Mint; some were unlawfully smuggled out and at least two left the Mint lawfully.

One 1933 double eagle was sold to King Farouk of Egypt, a coin collector, in 1944. This coin had been unlawfully smuggled out of the Mint, but the Government "had improvidently issued an export license," which muddied the issue of who rightfully possessed the coin. (J.A. 28.) In 1995, an English coin dealer, Stephen Fenton, purchased that coin for approximately $200,000. Fenton then contacted a coin dealer in the United States, who subsequently became a confidential informant for the U.S. Secret Service ("Secret Service"). The confidential informant convinced Fenton to bring the coin to the United States in 1996. The Secret Service seized the coin from Fenton in New York City, and litigation ensued. The Government ultimately settled with Fenton, agreeing to sell the coin at auction and divide the proceeds equally. The Fenton coin was auctioned in 2002 for nearly $7.6 million.

The appellants in this case are Joan Langbord and her sons, Roy and David Langbord (collectively, the "Langbords"). Shortly after the Fenton coin sold at auction, Joan Langbord allegedly discovered ten 1933 double eagles (the "Double Eagles") in a safe deposit box originally belonging to her deceased father, Israel Switt. Several decades earlier, the Secret Service suspected that Switt, an antique dealer in Philadelphia, and George McCann, a former Philadelphia Mint cashier, unlawfully smuggled 1933 double eagles out of the Philadelphia Mint; however, Switt's involvement in this scheme was never proven.

In 2004, the Langbords' counsel informed the Mint about the Double Eagles that the Langbords had discovered. The Langbords sought an agreement similar to the Fenton coin compromise.  The Mint's attorneys stated that they "would be willing to discuss the matter" and that they were "amenable to a discussion" on that topic.  (J.A. 142.)  The Langbords, explicitly reserving their rights to the Double Eagles, made the coins available to the Government for the sole purpose of authentication. (J.A. 806.)  Shortly thereafter, the agencies involved—i.e., the U.S. Attorney's Office for the District of Columbia, the Secret Service, the U.S. Department of the Treasury ("Treasury"), and the Mint—met to discuss how to proceed.  A memorandum summarizing the meeting states that "[a]ll the agencies involved, with the exception of the US Mint, are in favor of pursuing forfeiture." (J.A. 818.) Only the Mint "assert[ed] that the coins are government property and should be returned [to the Mint] without the need for forfeiture." (*Id.*)

The Double Eagles were authenticated, and the Treasury sided with the Mint, deciding not to institute a judicial civil forfeiture proceeding.  When the Langbords' counsel requested return of the Double Eagles, the Mint's counsel wrote to him, stating, "[t]he United States Mint has no intention of seeking forfeiture of these ten Double Eagles because they already are, and always have been, property belonging to the United States; this makes forfeiture proceedings entirely unnecessary." (J.A. 823.)  In response, the Langbords' counsel submitted a "seized asset claim" on September 9, 2005, demanding the return of the Double Eagles or the institution of a judicial civil forfeiture proceeding.  (J.A. 828-35.)  As described below, a seized asset claim starts the process whereby the Government must

7

either institute a judicial civil forfeiture proceeding or return the seized property. Nevertheless, in response to the seized asset claim, the Mint responded that it was "returning these documents . . . without action," again stating that "[t]here is simply no basis for the Government to initiate forfeiture proceedings on property to which the United States holds title."[3] (J.A. 837.)

In the face of the Government's refusal, the Langbords instituted this civil action in December 2006. The Langbords asserted two claims for violations of the Administrative Procedure Act ("APA"), a claim for violation of CAFRA, a Fifth Amendment claim, a Fourth Amendment claim, a claim for mandamus, and two claims under the Federal Tort Claims Act ("FTCA") for replevin and conversion.

The parties filed cross-motions for summary judgment. On July 29, 2009, the District Court ruled in favor of the Government on the CAFRA claim, holding that CAFRA's

---

[3] The Mint's terse letter also denied that the Government had seized the Double Eagles, an assertion which, as described below, the District Court correctly rejected. (*See* J.A. 837 ("As you and your client are aware, there has been no seizure of any property that is owned by, or that could be claimed to be owned by, your client."); J.A. 838 ("In short, there has been no seizure of property; your client voluntarily surrendered to the United States property belonging to the United States.").) This denial starkly contrasts with a contemporaneous internal Government memorandum that conceded that a seizure had occurred. (*See* J.A. 818 ("On September 22, 2004, the [Secret Service] seized ten coins referred to as '1933 Gold Double Eagle Coins' . . . .").)

90-day deadline in § 983(a)(3) did not apply because it applies only to nonjudicial civil forfeitures and no such forfeiture had occurred here.  It reasoned that: (1) a "non-judicial civil forfeiture 'is commenced when the Government sends notice of the forfeiture proceeding to potential claimants'"; (2) "the Government never sent [the Langbords] such a notice"; and thus (3) "the Government never began an administrative forfeiture proceeding[4] and therefore the requirements of § 983(a) [namely, the 90-day deadline] do not apply."  (J.A. 146 (quoting Stefan D. Cassella, Asset Forfeiture Law in the United States 143 (1st ed. 2007) [hereinafter Cassella First Edition]).)  The District Court did find, however, that the Government had violated the Langbords' Fourth Amendment right against unreasonable seizures and their Fifth Amendment due process right by taking the Double Eagles contrary to the parties' agreement. It held that the remedy for these constitutional violations was for the Government either to return the coins or to institute a judicial civil forfeiture proceeding, which is the same result that § 983(a)(3) demands, but without the 90-day deadline. The District Court granted the Government's summary judgment motion on the APA claims and postponed ruling on the FTCA claims.

As ordered by the District Court, the Government sought leave to file a judicial civil forfeiture complaint on September 28, 2009.  The complaint alleged that the Double Eagles were "embezzled, stolen, purloined, knowingly converted to private use, or taken from the United States Mint in Philadelphia without authority, and [were] concealed and

---

[4] As used here, "administrative forfeiture" is synonymous with "nonjudicial civil forfeiture."

retained with the intent to convert [them] to private use or gain" in violation of 18 U.S.C. § 641. (J.A. 1178.) The Government's proposed complaint also included a declaratory judgment claim that "the disputed Double Eagles were not lawfully removed from the United States Mint and that accordingly, as a matter of law, they remain property of the United States." (J.A. 1180.)

Over the Langbords' objection, the District Court granted leave to file portions of the complaint, including the forfeiture claim and the declaratory judgment claim. It also ruled that the Langbords had a right to a jury trial on the forfeiture claim but not on the declaratory judgment claim. A jury trial was held on the forfeiture claim, and the jury returned a verdict for the Government on July 20, 2011, finding that the Double Eagles had been stolen from the Mint. As a result of the jury verdict, the District Court entered judgment for the Government on its forfeiture claim, as well as on the related declaratory judgment claim.

On appeal, the Langbords argue that the District Court erred by granting summary judgment for the Government on the issue of CAFRA's 90-day statutory deadline for filing a judicial civil forfeiture action. They also argue that the District Court erred by allowing the Government's declaratory judgment claim to proceed and by denying the Langbords' request to have the declaratory judgment claim tried by a jury. In addition, the Langbords appeal the District Court's admission of certain evidence at trial,[5] argue that the

_____

[5] The Langbords persuasively argue that the hearsay-within-hearsay rule, Fed. R. Evid. 805, does apply to ancient documents admitted pursuant to Rule 803(16), contrary to the

10

District Court improperly instructed the jury on criminal intent, and urge that the Government cannot seize property as a result of an 18 U.S.C. § 641 violation—i.e., stolen government property—unless the property was stolen or embezzled after 1948 when § 641 was enacted.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction over the Langbords' claims pursuant to 28 U.S.C. §§ 1331, 1346(b)(1), 1356, and 1361 and 5 U.S.C. § 702; it had jurisdiction over the Government's claims pursuant to 28 U.S.C. §§ 1345 and 1355(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.

We "employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). We review questions of law de novo. *United States v. Mallory*, 765 F.3d 373, 381-82 (3d Cir. 2014).

---

District Court's holding. Although we do not reach the issue, the District Court appears to have been mistaken. *See United States v. Hajda*, 135 F.3d 439, 444 (7th Cir. 1998) ("These documents are more than 20 years old and they were properly authenticated, so they are exceptions to the hearsay rule admissible under Rule 803(16) of the Federal Rules of Evidence. However, this admissibility exception applies only to the document itself. If the document contains more than one level of hearsay, an appropriate exception must be found for each level.").

### III. Discussion

#### A. The CAFRA Violation

The Government was required either to file a judicial civil forfeiture complaint or to return the Double Eagles within 90 days of receipt of the Langbords' seized asset claim under 18 U.S.C. § 983(a)(3)(A). Because the Government failed to do so, the Langbords are entitled to the return of the Double Eagles.

The Government's position as to why it did not need to fulfill its obligation under § 983(a)(3)(A) has morphed over time. When the Government initially returned the Langbords' seized asset claim without action, it claimed that it did not need to abide by CAFRA because the property was stolen government property. Now, the Government's principal argument is that it did not need to abide by CAFRA because it never sent a notice to the Langbords that it was pursuing forfeiture, thereby relieving it of its obligation to institute a judicial civil forfeiture proceeding. Neither of these arguments nor any of the Government's remaining arguments have merit.

The Government's original argument that stolen government property falls outside the protections of CAFRA is incorrect for a simple reason: Congress has specifically enumerated theft or embezzlement of government property as one of the crimes to which CAFRA applies. Congress has provided that "[t]he following property *is subject to forfeiture* to the United States: . . . . [a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as

defined in section 1956(c)(7) of this title)." 18 U.S.C. § 981(a)(1)(C) (emphasis added). "[S]pecified unlawful activity" includes "an offense under . . . section 641 (relating to public money, property, or records)." *Id.* § 1956(c)(7)(D). Section 641, the very statute alleged in the Government's complaint to have been violated, criminalizes the theft or embezzlement "of any record, voucher, money, or *thing of value of the United States* or of any department or agency thereof." *Id.* § 641 (emphasis added). The Government claims that the Double Eagles are government property—i.e., things of value of the United States. (J.A. 1178.) Clearly, CAFRA applies when the underlying property is stolen government property.

The Government's original argument also appears to have been based on the notion that the Langbords voluntarily surrendered the Double Eagles to the Government. However, on summary judgment, the District Court concluded that the Government's seizure of the coins was unconstitutional, and the Government has not cross-appealed this ruling.[6] The Langbords turned the Double Eagles over to the Government for the sole purpose of authenticating them, and they "specifically reserve[d] all rights and remedies with respect to the Coins." (J.A. 806.) As the District Court found, the Langbords' "letter communicated that [they] did not intend the transfer to be an unconditional, permanent surrender," and "once [they] became aware that the Government intended to

---

[6] Regardless of whether the Government could have taken an interlocutory appeal of the District Court's July 29, 2009 summary judgment order, the Government could have cross-appealed at the conclusion of the case, after the jury trial. It did not.

keep the coins permanently, they promptly requested their return." (J.A. 150.)

The Government's seizure of property—even under a theory that the property ultimately belongs to the Government—can violate the Fourth and Fifth Amendment. *See Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) ("A 'seizure' of property, we have explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *see also Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994) ("The Leshers' constitutional right against unreasonable seizures is not vitiated merely because the [government] believed the dog belonged to the [Little Rock Police Department].").  Here, the Langbords had a possessory right that they preserved in writing when they turned the Double Eagles over for authentication.  Even if the Double Eagles ultimately were stolen government property, the Government's seizure of them was unconstitutional, as the District Court determined.

With this original line of argument rejected, we turn to the Government's main assertion on appeal—namely, that all it needs to do to avoid CAFRA's protections is to refrain from sending notice that it is commencing a forfeiture proceeding.  As a corollary, the Government argues that it can avoid CAFRA by unequivocally stating in its communication with the people whose property was seized that it is not seeking forfeiture.  If the Government seizes property claimed by someone else—whether it be money, a car, or even a house— the Government argues it can avoid the protections Congress sought to put in place simply by saying, "we are not seeking forfeiture."

The Langbords are correct in urging that we reject these arguments. The Government was required either to return their property or to institute a judicial civil forfeiture proceeding within 90 days of the Langbords' submission of a seized asset claim. *See* 18 U.S.C. § 983(a)(3)(A) ("Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture . . . or return the property . . . ."). This is what CAFRA envisions: the Government cannot unilaterally ignore a seized asset claim. Instead, the Government must either return the seized property or file a complaint in court to seek forfeiture of the seized property within 90 days of receipt of the seized asset claim. Our dissenting colleague takes issue with this proposition, urging that, although the Government was required to have followed the 90-day deadline in § 983(a)(3), its failure to do so does not require the Government to return the Double Eagles to the Langbords. This is a novel argument, never posited by the Government, and, as we discuss below, not supported by any relevant case authority.[7] Moreover, it rewrites the statute.

Section 983(a) contains three independent subparts: in (a)(1) it imposes a 60-day timeline for the Government to send written notice of forfeiture *in certain cases*; in (a)(2) it creates a mechanism by which a person claiming seized

---

[7] We note, further, that of the approximately thirty cases cited in Parts I and II of the dissent, only one was ever referred to in any of the briefing—cited in a footnote in the Government's Brief for an unrelated issue. As we discuss below, the jurisprudence the dissent cites is off-point, dealing with a different provision of CAFRA, § 983(a)(1), and even entirely different statutes. *See infra* note 19.

property can file a seized asset claim, *whether or not the Government has sent or is required to send notice*; and in (a)(3) it imposes a 90-day timeline, *after a seized asset claim has been filed*, for the Government to respond either by returning the property or by filing a complaint in court for judicial forfeiture.

The District Court incorrectly reasoned that the seized asset claim provision, § 983(a)(2), and the 90-day provision, § 983(a)(3), are activated only if written notice is sent under § 983(a)(1).  This is wrong.  The District Court combined § 983(a)(1) with (a)(2) and (a)(3) and held that, in any forfeiture situation in which the Government does not send notice under § 983(a)(1), no one is able to file a seized asset claim pursuant to § 983(a)(2).  But a careful reading of the statutory provisions demonstrates that this is not the case:

> (1)(A)(i) Except as provided in clauses (ii) through (v), in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, *with respect to which the Government is required to send written notice to interested parties*, such notice shall be sent in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure. . . .
>
> (2)(A) *Any person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute* may file a claim with the appropriate official after the seizure. . . .
>
> (3)(A) Not later than 90 days *after a claim has been filed*, the Government shall file a

complaint for forfeiture . . . or return the property pending the filing of a complaint . . . . (3)(B) If the Government does not—(i) file a complaint for forfeiture or return the property, in accordance with subparagraph [(3)](A) . . . the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General, and *may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.*[8]

18 U.S.C. § 983(a) (emphasis added).

Section 983(a)(1)(A) provides for the manner and timing of notice that the Government must use in those "nonjudicial civil forfeiture proceeding[s] . . . *with respect to which the Government is required to send written notice.*" *Id.* § 983(a)(1)(A)(i) (emphasis added). This provision recognizes that another law—separate from CAFRA—provides that notice must be sent in *some*, but not all,

---

[8] The dissent points to the phrase, "return the property pending the filing of a complaint," in § 983(a)(3)(A), as creating ambiguity as to the Government's obligations. (*See* Diss. Op. at 3.) However, there is no question that the Government did not return the Double Eagles pending the filing of a complaint. Therefore, the Government did not comply with § 983(a)(3)(A), which then requires that "the Government shall promptly release the property . . . and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense." 18 U.S.C. § 983(a)(3)(B).

nonjudicial civil forfeiture proceedings. *See* 19 U.S.C. § 1607(a).[9] Section 1607(a) does not speak to the manner or timing of the notice; that is what § 983(a)(1) does. The Government errs in urging that, when notice of forfeiture is either not required or not given within 60 days of a seizure under § 983(a)(1), that insulates the Government from its obligation under § 983(a)(3) to act within 90 days of receiving a seized asset claim. Instead, § 983(a)(2) and (a)(3) act independently from § 983(a)(1): whether notice has been filed has nothing to do with the Government's duty to respond to a seized asset claim. Therefore, § 983(a)(1) is irrelevant to the analysis that we must conduct under § 983(a)(2) and (a)(3).

The text of § 983(a)(3) provides that, "[n]ot later than 90 days *after a claim has been filed*, the Government shall file a complaint for forfeiture . . . or return the property." 18

---

[9] Notice is required in the following situations:

> (1) the value of such seized vessel, vehicle, aircraft, merchandise, or baggage does not exceed $ 500,000;
>
> (2) such seized merchandise is merchandise the importation of which is prohibited;
>
> (3) such seized vessel, vehicle, or aircraft was used to import, export, transport, or store any controlled substance or listed chemical; or
>
> (4) such seized merchandise is any monetary instrument within the meaning of section 5312(a)(3) of title 31 of the United States Code; . . . .

19 U.S.C. § 1607(a).

U.S.C. § 983(a)(3)(A) (emphasis added). And the requirements for filing a claim are laid out in § 983(a)(2), not § 983(a)(1). "*Any person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute* may file a claim with the appropriate official after the seizure." *Id.* § 983(a)(2)(A) (emphasis added). Here, the Government's seizure of the property is rightfully considered a nonjudicial civil forfeiture proceeding. *See* Stefan D. Cassella, Asset Forfeiture Law in the United States 10 (2d ed. 2013) [hereinafter Cassella Second Edition] ("Basically, an administrative forfeiture begins when a federal law enforcement agency with statutory authority in a given area (e.g., DEA in a drug case, FBI in a fraud case, ATF in a firearms case) seizes property discovered in the course of an investigation.").[10] In other words, it is when the agency "seizes property" that the "administrative forfeiture begins." *Id.* Because a nonjudicial civil forfeiture proceeding occurred when the Government seized the coins, the Langbords had the right to submit a seized asset claim under § 983(a)(2), and, when they did, they triggered the Government's obligation under § 983(a)(3) to bring a judicial civil forfeiture proceeding or to return the property within 90 days.

The Government's insistence that "[t]he statute says that an administrative forfeiture proceeding is initiated by the government providing notice of the seizure" is baffling. (Oral

---

[10] While most forfeitures result from the Government's seizure of property derived from illegal activity, CAFRA covers stolen government property in the hands of third parties, as was explained above. *See* 18 U.S.C. § 981(a)(1)(C) (cross-referencing 18 U.S.C. § 1956(c)(7), which cross-references 18 U.S.C. § 641).

Arg. Tr. 52:7-9, Nov. 19, 2014.)  But the District Court agreed.  Quoting from a section of a treatise that does not discuss the applicability of § 983(a)(3), the District Court held that "[a] non-judicial civil forfeiture proceeding 'is commenced when the Government sends notice of the forfeiture proceeding to potential claimants.'"  (J.A. 146 (quoting Cassella First Edition, *supra*, at 143).)  However, as the language of § 983(a)(1)(A)(i) makes clear, only in *some* nonjudicial civil forfeiture proceedings under a civil forfeiture statute[11] is the Government required to send written notice.  Otherwise, the subsection would not need to include the phrase, "in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute, *with respect to which the Government is required to send written notice to interested parties*."  18 U.S.C. § 983(a)(1)(A)(i) (emphasis added).  It cannot be that a case where no notice of forfeiture is required is nonetheless beholden to the Government's notice as starting the administrative process.  The frivolity of the Government's position is demonstrated by the fact that it would afford the Government total discretion to avoid CAFRA altogether by unilaterally deciding not to notify the putative owner of the seizure.

Further proof of why the Government is incorrect appears in § 983(e)(1), which provides that "[a]ny person

---

[11] There is no dispute that the Government acted "under a civil forfeiture statute."  The definition of "civil forfeiture statute" is "any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense."  18 U.S.C. § 983(i)(1).  There are five enumerated exceptions, none of which applies here.  *See id.* § 983(i)(2).

entitled to written notice *in any nonjudicial civil forfeiture proceeding* under a civil forfeiture statute *who does not receive such notice* may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property." *Id.* § 983(e)(1) (emphasis added). Section 983(e)(1) is triggered only when there is a "nonjudicial civil forfeiture proceeding" in which the Government has *not sent notice* of its intent to pursue forfeiture. But if such a proceeding can be commenced only when the Government *has sent notice* of its intent, then the statute makes no sense. In other words, if a nonjudicial civil forfeiture proceeding commences only when the Government sends notice that it is instituting such a proceeding, then § 983(e)(1), which provides a remedy in any nonjudicial civil forfeiture proceeding in which the Government was required but failed to give notice of its intent to pursue forfeiture, would be nonsensical. Therefore, it cannot be the case that a nonjudicial civil forfeiture proceeding is initiated only when the Government sends notice that it intends to commence such a proceeding.[12] Section 983(a)(1) does not initiate a

---

[12] To assert that a nonjudicial civil forfeiture proceeding occurs only when the Government sends notice, the Government relies upon cases interpreting the 60-day notice requirement of § 983(a)(1), which do not address the applicability of the 90-day requirement in § 983(a)(3). *See, e.g.*, *United States v. Approximately $1,305,105 in Assorted Silver Bars & Gold & Silver Coins*, No. 12-C-7505, 2013 WL 453195, at *2-3 (N.D. Ill. Feb. 6, 2013), *rev'd*, No. 13-1452 (7th Cir. July 22, 2013); *United States v. Assets Described in "Attachment A"*, No. 6:09-cv-1852, 2010 WL 1893327, at *6 (M.D. Fla. May 11, 2010); *United States v. $147,900*, No. 1:06-cv-197, 2009 WL 903356, at *4 (M.D.N.C. Mar. 31,

nonjudicial civil forfeiture proceeding; rather, it provides the manner of giving notice when the provisions requiring notice apply.

Instead, a "nonjudicial civil forfeiture proceeding" commences when the Government has seized property. Cassella Second Edition, *supra*, at 10. When the Government has seized property, then the person from whom the property was seized has the right to file a seized asset claim pursuant to § 983(a)(2)(A), thereby triggering the 90-day deadline in § 983(a)(3)(A). If the Government has not seized property, then it has no obligation to respond to a seized asset claim. Thus, the horrors described by the Government at oral argument—e.g., pro se prisoners filing seized asset claims for jailhouse televisions—is of no concern here. Because no seizure occurred in those situations, the Government would not have to file a judicial forfeiture action, even if someone files a seized asset claim. It is only when a seizure occurs that there is a "nonjudicial civil forfeiture proceeding" and thus the Government must respond.[13] Here, the Government

---

2009), *vacated in part*, 450 F. App'x 261 (4th Cir. 2011); *DWB Holding Co. v. United States*, 593 F. Supp. 2d 1271, 1272 (M.D. Fla. 2009).

[13] (*See* Oral Arg. Tr. 59:4-15 ("The other problem with this notion that somebody can create their own forfeiture proceeding by filing a seized asset claim is we would be bombarded by litigation. . . . All the prisoners who say, [y]ou know, that TV set on the wall is mine, I declare it. Here's a seized asset claim. You have 90 days to file a judicial forfeiture against me, when the government never initiated any forfeiture at all because the TV set [was never theirs]— we can go on and on with examples.").) This example is off-

unquestionably committed a seizure (and an unconstitutional one at that), so it was required to respond to the Langbords' seized asset claim, either by filing a judicial complaint within 90 days or by returning the property. *See* 18 U.S.C. § 983(a)(3)(A). Instead, the Government forced the Langbords to commence this decade-long ordeal for the return of the Double Eagles.

The Government's remaining arguments as to why the 90-day deadline should not apply also lack merit.[14] These

---

topic because the Government did not seize the TV set, and, therefore, no nonjudicial civil forfeiture proceeding has occurred. Accordingly, the Government would have no obligation to respond to the seized asset claim.

[14] The Government has not argued that the Langbords waived their right to CAFRA's 90-day deadline by consenting to the forfeiture proceeding, which the District Court ordered as a remedy for the Government's unconstitutional seizure of the Double Eagles. Accordingly, the Government has waived any potential waiver argument. *See Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 250 (3d Cir. 2013) ("[A] party can waive a waiver argument by not making the argument below or in its briefs."). Regardless, the Langbords have clearly and repeatedly raised the argument that the Government violated the 90-day deadline in § 983(a)(3). (*See, e.g.*, J.A. 628, 775-78.) We note that this is why there was no "agreement of the parties" as to the Government's late filing of the forfeiture complaint. *See* 18 U.S.C. § 983(a)(3)(A) ("Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture . . . , except that a court in the district in which the complaint will

arguments are: (1) the value of the Double Eagles prevented them from being subject to CAFRA; (2) the Mint was not authorized to bring a forfeiture action; and (3) § 983(a)(3)(A)'s "good cause" exception applies.

First, the Government's argument that the Double Eagles were not subject to forfeiture because their value exceeded $500,000 is unavailing. This argument relies on 19 U.S.C. § 1607(a), which states only that "the appropriate customs officer shall cause a notice of the seizure of such articles and the intention to forfeit . . . to be published for at least three successive weeks in such manner as the Secretary of the Treasury may direct." 19 U.S.C. § 1607(a). One of the instances in which notice is not required is when the value of the property exceeds $500,000. *Id.* § 1607(a)(1). Because the Government assumes that notice is required to commence a forfeiture proceeding and because § 1607(a) demonstrates that no notice was required in this case, as the Double Eagles' value allegedly exceeds $500,000, the Government argues that no forfeiture has occurred here. This argument fails. Section 1607(a) is relevant to determining whether the Government was obligated to provide notice of forfeiture within 60 days pursuant to 18 U.S.C. § 983(a)(1), but it does not relieve the Government of its 90-day deadline in § 983(a)(3). Notice is not a prerequisite for persons to file a seized asset claim and trigger the 90-day deadline in § 983(a)(3).

Second, the Government's argument that its conduct did not amount to a nonjudicial civil forfeiture since the Mint

---

be filed may extend the period for filing . . . upon agreement of the parties.").

was not authorized to conduct a forfeiture under 31 U.S.C.
§ 9703 fails because the Mint is an entity within the Treasury
and was not the only agency involved here. Section
9703(o)(1) provides a definition for "Department of the
Treasury law enforcement organization," a definition which
includes the Secret Service but excludes the Mint. 31 U.S.C.
§ 9703(o)(1).[15] A separate subsection provides that "property
and currency shall be deemed to be forfeited pursuant to a law
enforced or administered by a Department of the Treasury
law enforcement organization if it is forfeited pursuant to—
. . . (B) a civil administrative forfeiture proceeding conducted
by a Department of the Treasury law enforcement
organization." *Id.* § 9703(m)(2)(B). But the Secret Service
is the agency that "seized" the Double Eagles on September
22, 2004 and that continued to have custody of the coins until
months later. (J.A. 818.) The Secret Service is authorized to
conduct a forfeiture pursuant to § 9703. That the Treasury
ordered the Secret Service to give the Double Eagles to the
Mint (J.A. 821) does not insulate the Government from
CAFRA. Section 9703 sought to limit various agencies'
ability to conduct seizures; it does not give agencies that are
not authorized to conduct seizures a carte blanche ability to
avoid CAFRA.

Third, § 983(a)(3)(A)'s "good cause" exception does
not excuse the Government's failings here. Pursuant to the
statute, "[n]ot later than 90 days after a claim has been filed,
the Government *shall* file a complaint for forfeiture . . . ,
except that a court in the district in which the complaint will
be filed *may extend the period for filing a complaint for good*

---

[15] We note an inconsistency in the U.S. Code: there are two
separate statutes both identified as 31 U.S.C. § 9703.

*cause shown or upon agreement of the parties*." 18 U.S.C. § 983(a)(3)(A) (emphasis added). We cannot help but read this language ("shall file . . . except . . . may extend") to mean that the good cause exception allows the Government to seek an extension of time only *before* the 90-day period expires. *See United States v. Funds from Fifth Third Bank Account*, No. 13-11728, 2013 WL 5914101, at \*9 (E.D. Mich. Nov. 4, 2013) ("Given the narrow language used [in § 983(a)(3)(A)], this Court concludes that the Government has to seek the extension before the limitations period passes and that it cannot seek a 'retroactive extension.'"); *see also United States v. One 1991 Ford Mustang LX*, 909 F. Supp. 831, 834 (D. Colo. 1996); *United States v. 1986 Ford Bronco*, 782 F. Supp. 1543, 1546 (S.D. Fla. 1992); *United States v. One White 1987 Tempest Sport Boat*, 726 F. Supp. 7, 9 (D. Mass. 1989). The period cannot be extended if it has already passed.[16]

---

[16] Congress included the "good cause" exception to "make it unnecessary for the government, as it often must under current law, to file a complaint and then immediately request a stay under Rule 26, Federal Rules of Civil Procedure, or under other statutory authority, to avoid jeopardizing a criminal case." H.R. Rep. No. 105-358(I), at 45 (1997) (footnote omitted). Congress explained that "the court should grant an extension of time where the filing of the complaint, which is required to recite the factual basis in some detail, would reveal facts concerning a pending investigation, undercover operation, or court-authorized electronic surveillance, or would jeopardize government witnesses." *Id.* at 44 (footnote omitted). Furthermore, "the court could grant the extension to allow the government to include the forfeiture in a criminal indictment, and thus avoid the

Even if the statute did permit retroactive extensions, the Government would not be entitled to an extension for two reasons. First, the Government's delay was not minor; the Government failed to file a complaint until September 28, 2009—four years and nineteen days after the Langbords filed their seized asset claim—and only did so under court order. *See United States v. $39,480.00 in U.S. Currency*, 190 F. Supp. 2d 929, 932 & n.9 (W.D. Tex. 2002) (permitting a retroactive extension when the government was one day late). Second, according to the Government's own documents, after the Secret Service seized the Double Eagles, "[a]ll the agencies involved, with the exception of the US Mint, [were] in favor of pursuing forfeiture." (J.A. 818.) Thus, the Government knew that it was obligated to bring a judicial civil forfeiture proceeding or to return the property, but refused to do so.[17] As a result, the Government cannot show good cause.[18]

---

necessity of initiating parallel civil and criminal forfeitures." *Id.* Congress's reasons for including the good cause exception are certainly not applicable here.

[17] We note that an unjustified mistake of law can hardly be considered "good cause." *See Green v. Humphrey Elevator & Truck Co.*, 816 F.2d 877, 884 (3d Cir. 1987) ("We need not decide here, the parameters of the 'good cause' exception to Rule 4(j) for it is clear that an unjustified misunderstanding of the requirements of the law will not suffice.").

[18] The Government incorrectly states that the District Court found good cause here. The District Court stated no more than that "the Government *might* still have had an opportunity to file a judicial forfeiture action" under the good cause exception. (J.A. 148 n.3 (emphasis added).) However, it did not find good cause, nor could it have.

Accordingly, a nonjudicial civil forfeiture proceeding occurred here, and the Government missed the 90-day deadline under § 983(a)(3). On September 9, 2005, when the Langbords submitted their seized asset claim, the 90-day period in § 983(a)(3) commenced. *See* 18 U.S.C. § 983(a)(3)(A). The Government failed to return the Langbords' property or institute a judicial civil forfeiture proceeding within 90 days. Having failed to do so, it must return the Double Eagles to the Langbords.[19]

---

[19] While the dissent refers to a myriad of cases purportedly contradicting the reasoning and the result we embrace, those cases are easily distinguishable, and the impact of CAFRA's specific language in § 983(a)(3) could not be clearer. The dissent's argument—i.e., that the Government should have followed § 983(a)(3) but that its failure does not lead to the return of the Langbords' property—is a novel position that was not urged by the Government. Moreover, the statutes that are the subject of the cases cited in the dissent have little in common with CAFRA. *See, e.g., Dolan v. United States*, 560 U.S. 605 (2010) (Mandatory Restitution Act); *Shenango Inc. v. Apfel*, 307 F.3d 174 (3d Cir. 2002) (Coal Act). It relies on forfeiture cases that do not involve § 983(a)(3) at all. *See, e.g., Garcia v. Meza*, 235 F.3d 287 (7th Cir. 2000); *United States v. Giraldo*, 45 F.3d 509 (1st Cir. 1995); *Lopez v. United States*, 863 F. Supp. 2d 127 (D. Mass. 2012); *DeSaro v. United States*, No. 06-cv-20531 (S.D. Fla. Aug. 8, 2006). It relies on cases that describe whether a statutory deadline is jurisdictional, which is relevant for situations in which the claimant failed to timely argue that the 90-day deadline in § 983(a)(3) required the return of the property, with the claimant instead making the § 983(a)(3) argument in, e.g., a Rule 60 motion to vacate a judgment. *See, e.g., United States*

*v. Vazquez-Alvarez*, 760 F.3d 193 (2d Cir. 2014) (per curiam); *United States v. Wilson*, 699 F.3d 789 (4th Cir. 2012); *United States v. Martin*, 662 F.3d 301 (4th Cir. 2011). Here, in contrast, the Langbords have pressed this argument since day one. *See supra* note 14. And it relies on cases interpreting the 60-day notice deadline in § 983(a)(1). *See, e.g.*, *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006 (9th Cir. 2013); *United States v. $114,031.00 in U.S. Currency*, No. 06-cv-21820, 2007 WL 2904154 (S.D. Fla. Oct. 4, 2007); *Salmo v. United States*, No. 06-12909, 2006 WL 2975503 (E.D. Mich. Oct. 17, 2006); *Manjarrez v. U.S. Dep't of the Treasury*, No. 01-7530, 2002 WL 31870533 (N.D. Ill. Dec. 19, 2002). The 60-day notice deadline in § 983(a)(1) is fundamentally different from the 90-day deadline in § 983(a)(3) because, if the Government misses § 983(a)(1)'s 60-day deadline, CAFRA specifically allows the Government "to commence a forfeiture proceeding at a later time." 18 U.S.C. § 983(a)(1)(F). There is no analogous provision that gives the Government a second chance if it misses the 90-day deadline in § 983(a)(3) or otherwise excuses the failure to act. Congress could have included such a provision, but it did not. As noted by *Wilson*—a case relied upon by the dissent—"the time limit imposed on the government by § 983(a)(3) is mandatory." 699 F.3d at 791. "If the Government does not file a complaint or take other action within 90 days as required, *it must 'release the property* pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.'" *Id.* at 795 (emphasis added) (quoting 18 U.S.C. § 983(a)(3)(B)). In that case, Wilson lost merely because he raised his § 983(a)(3) argument too late, i.e., in a Rule 60 motion to vacate the

B.  The Declaratory Judgment

Given this conclusion, the District Court should not have ordered the declaratory judgment claim to proceed, and indeed we must vacate the declaratory judgment.  The declaratory judgment entered by the District Court was the following:

> The disputed Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States, regardless of (1) the applicability of CAFRA to the disputed Double Eagles, (2) Claimants' [i.e., the Langbords'] state of mind with respect to the coins, or (3) how the coins came into Claimants' possession.

(J.A. 52-53.)  The District Court opined that "the declaration concerns a different–and broader–set of legal rights than the narrow question decided by the jury, which was simply whether the Government had proven its claim of forfeiture of the 1933 Double Eagles."  (J.A. 53-54.)  However, the District Court recognized that "the jury's verdict [on the forfeiture claim] dictates the outcome of the declaratory judgment claim" and that it made the declaration "solely on the basis of facts necessarily (although implicitly) found by the jury."  (J.A. 52.)

---

judgment.  *See id.* at 707 ("Wilson forfeited his limitations argument by not raising it during the forfeiture proceedings.").

We will vacate the declaratory judgment for two reasons. First, the declaratory judgment proceeding cannot be recognized because, having missed CAFRA's 90-day deadline, the Government cannot use a declaratory judgment proceeding to circumvent that deadline. We have held that a "statute of limitations can[not] be circumvented merely by '[d]raping [the] claim in the raiment of the Declaratory Judgment Act.'" *Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126 F.3d 178, 185 (3d Cir. 1997) (quoting *Gilbert v. City of Cambridge*, 932 F.2d 51, 58 (1st Cir. 1991)). *Algrant*'s focus is on whether the claims are "barred by a statute of limitations applicable to a concurrent legal remedy," which means that the declaratory judgment is "essentially predicated upon the same cause of action." *Id.* at 184-85. Here, as the District Court acknowledged, the forfeiture and declaratory judgment claims are undoubtedly predicated upon the same cause of action, and, therefore, the declaratory judgment claim cannot be used to circumvent CAFRA's 90-day deadline.

Second, the declaratory judgment proceeding cannot be recognized because CAFRA amounts to a "special statutory proceeding." Federal Rule of Civil Procedure 57 states that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. However, the Advisory Committee's Note qualifies Rule 57 by stating that a "declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings." Fed. R. Civ. P. 57 advisory committee's note. The Supreme Court has

confirmed that declaratory relief "should not be granted where a special statutory proceeding has been provided." *Katzenbach v. McClung*, 379 U.S. 294, 296 (1964).

Although no court has opined that CAFRA provides for a special statutory proceeding, conversely, no court has held that CAFRA does *not* provide for a special statutory proceeding. We hold that it does. To date, "a handful of categories of cases have been recognized as 'special statutory proceedings.'" *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006). "These include: (i) petitions for habeas corpus and motions to vacate criminal sentences; (ii) proceedings under the Civil Rights Act of 1964; and (iii) certain administrative proceedings." *Id.* (internal citations omitted). "Each of these categories involved procedures and remedies specifically tailored to a limited subset of cases, usually one brought under a particular statute." *Id.*

Here, there is no doubt that the realm of civil forfeiture involves "procedures and remedies specifically tailored to a limited subset of cases." *See id.* CAFRA provides a structured scheme, which gives the parties multiple deadlines to follow and puts a heightened burden on the Government. CAFRA, like the Civil Rights Act of 1964, involves procedures and remedies tailored to a limited subset of cases and preserves individual rights. Given this tailored scheme, even if the Government had filed a judicial action within 90 days from when the Langbords filed their seized asset claim (and therefore we did not have the *Algrant* issue of the Government using the declaratory judgment claim to circumvent CAFRA's 90-day deadline), the Government could not use the declaratory judgment to circumvent the specific remedy and heightened burden that CAFRA

provides.  Based on either of these alternative grounds, we must vacate the declaratory judgment.[20]

### C. The Remaining Issues

Because we will vacate the declaratory judgment, we do not address whether the jury should have decided that claim.  Furthermore, given that we will also vacate the judgment on the forfeiture claim, we do not address the multiple trial issues raised by the Langbords, nor do we address the mens rea required for a violation of 18 U.S.C. § 641, nor whether forfeiture is permitted for a § 641 violation where the theft or embezzlement of Government property occurred before § 641 was enacted in 1948.

## IV.  Conclusion

At the insistence of the Mint and against the wisdom of the Secret Service and multiple other agencies, the Government opted to ignore CAFRA.  Now, the Langbords are entitled to the return of the Double Eagles.  We will reverse in pertinent part the District Court's July 29, 2009 order, which denied the Langbords' cross-motion for partial summary judgment concerning the applicability of CAFRA, and will vacate all orders at issue on appeal that postdate the July 29, 2009 order,[21] including the jury verdict and the

---

[20] Given this disposition, we do not address the Langbords' remaining arguments as to why the declaratory judgment must be vacated.

[21] We will affirm the earlier order dated May 11, 2009, which denied both the Langbords' and the Government's motions to

District Court's order entering judgment.  We will remand for the District Court to order the Government to return the Double Eagles to the Langbords.

---

exclude expert witnesses. We express no opinion as to whether the expert testimony at trial was appropriate.

*Langbord v. U.S. Dep't of the Treasury*

No. 12-4574

Argued:  November 19, 2014

SLOVITER, <u>Circuit Judge</u>, <u>dissenting</u>:


The members of this panel agree on certain basic issues:  The Government of the United States (hereafter "Government") acted unconstitutionally when it seized the ten Golden Eagle coins that had been delivered to it on behalf of the Langbords for authentication and determined to retain those coins without proceeding to a hearing after the seizure.[1] And I agree with the District Court and the majority that the seizure took place when the Government sent its notice that it would not return the coins.

I also agree with the majority's view that the Government in this case rather casually treated its obligation

---

[1] The Government has chosen not to rely on the characterization of the Golden Eagles as "contraband" and thus does not argue the application of 18 U.S.C. § 983(a)(1)(F), which provides that "The Government shall not be required to return contraband or other property that the person from whom the property was seized may not legally possess."  Because gold may now be possessed, we will not try to determine whether the Golden Eagles were contraband at the time McCann and Switt illegally removed them from the Mint.

under CAFRA to proceed to a hearing. Although it acted for what turned out to be good reason (i.e. that because the Double Eagles were stolen from the Mint—a conclusion reached by two fact-finders after a full hearing—they were already Government property and there was no reason to subject them to forfeiture), the proper course of action was to institute forfeiture proceedings to allow a court to determine the disputed property rights. *See United States v. Barnard*, 72 F. Supp. 531, 532 (W.D. Tenn. 1947); App. at 59. The District Court, who throughout this case was the Honorable Legrome Davis of the Eastern District of Pennsylvania, agreed with the Langbords. The Court held that the "appropriate and authorized remedy for the Government's denial of Plaintiffs' due process rights is a prompt forfeiture hearing." App. at 166. It therefore effected a remedy by ruling: "Accordingly we will direct the Government to initiate a judicial forfeiture proceeding as part of this action on or before Monday, September 28, 2009." *Id*. In other words, the Langbords won that issue.

This, however, is where my agreement with the majority ends. I definitely do not agree with the majority's holding that the Langbords are now "entitled to the return of the Double Eagles," Maj. Op. at 12, because the Government failed to institute judicial civil forfeiture proceedings "within 90 days" of receiving the Langbords' self-styled seized asset claim. There is no provision of CAFRA that makes ultimate entitlement to the disputed property conditional on the amount of time before the Government files a forfeiture hearing. Although there is language in CAFRA that requires the Government to return items it seized or proceed to have the issue of ownership decided by a forfeiture proceeding, this does not mean that the claimants are entitled to

ownership of the property at issue, although the jury has determined that the property belongs to the Government, which is the result the majority appears to reach.

The statute does not state or suggest that the return is unconditional. In fact, the provision on which the majority relies, § 983(a)(3) provides "return the property" "pending the filing of a complaint . . . ." Neither the legislative history nor the majority explains the meaning of the "pending" condition.

The majority also asserts that CAFRA (through incorporation of another provision) requires that notice of a seizure must be given within 60 days of a seizure, which it argues at length is required in some but not all cases. I do not agree. I believe notice is required in all cases and the Constitution and the relevant statutes so require.

Finally, the majority vacates the District Court's award of declaratory judgment on a basis no court has accepted, and with which I cannot agree.

## I

The majority's position that the Government has lost its entitlement to its own property because it failed to follow the strict requirement of CAFRA as to the time to file a forfeiture suit has been rejected in principle by numerous courts, among them the Supreme Court of the United States, other courts of appeals, and many district courts. Those courts have held that the Government's failure to strictly adhere to a statutory timeframe does not deprive the Government of the chance to pursue the action contemplated by the statute.

3

In *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 558 (1983), the Supreme Court had before it a similar statute providing for forfeiture (in that case, of currency), which required the United States Attorney "if it appears probable that a forfeiture has been incurred" to "cause the proper proceedings to be commenced and prosecuted without delay." *Id*. (citing 19 U.S.C. § 1604). The Court, through Justice O'Connor writing for eight Justices, rejected the claimant's argument that the Government's "dilatory" commencement of civil forfeiture violated the claimant's right to due process. *Id.* at 561. Justice O'Connor noted that "The Government must be allowed some time to decide whether to institute forfeiture proceedings." *Id.* at 565. She further commented that the issue of "the length of time between the seizure [of the item at issue] and the initiation of the forfeiture trial—mirrors the concern of undue delay encompassed in the right to a speedy trial" analyzed in *Barker v. Wingo*, 407 U.S. 514 (1972), where the Court enunciated a balancing test. 461 U.S. at 564. After considering the relevant factors, the Court stated that although the Government's 18-month delay instituting civil forfeiture proceedings was "substantial," it was reasonable and the claimant had not asserted or shown that the delay prejudiced her ability to defend against the forfeiture. *Id.* at 569-70. The Court reversed the holding of the court of appeals dismissing the forfeiture action and remanded for forfeiture proceedings. *Id.* at 570.

That case was decided before the enactment of CAFRA, but similar reasoning has been applied by other courts dealing with forfeiture under CAFRA or statutes with similar provisions. One such example can be found in *United States v. Vazquez-Alvarez*, 760 F.3d 193 (2d Cir. 2014).

Claimant Vazquez interposed two grounds to defeat the Government's forfeiture of currency he had carried into the country: one, irrelevant here, was that the Government did not execute its warrant against the cash. *Id.* at 195. The second, most relevant here, was that the Government failed to bring its forfeiture action within the time set by the statute. *Id.* Both, he argued, stripped the district court of its jurisdiction over the res. *Id.* The Second Circuit, in a per curiam opinion, stated, "We disagree. The statutory time limits for commencing a forfeiture action are claims-processing rules, not jurisdictional rules." *Id.* Ultimately dismissing Vazquez for lack of standing, the court rejected the claimant's allegation that he should prevail because the Government filed its civil forfeiture action "well after the 60-day time period allotted by 18 U.S.C. § 983(a)(1)(A)(ii)." *Id.* at 198. It stated, "assuming without deciding that the [G]overnment filed late, a late-filed forfeiture action would not deprive the district court of subject matter jurisdiction." *Id.*

The *Vazquez-Alvarez* court relied in part on a Fourth Circuit decision, *United States v. Wilson*, 699 F.3d 789 (4th Cir. 2012). In *Wilson*, the claimant sought to set aside a forfeiture judgment as void because the Government had filed its forfeiture complaint later than § 983(a)(3)'s 90-day time limit. 699 F.3d at 791. The claimant had not raised the timing objection during the forfeiture proceeding, but argued that "the time limit was jurisdictional and therefore was not forfeited by his failure to raise it." *Id.* The Fourth Circuit rejected the claimant's argument, stating, "While the time limit imposed on the [G]overnment by § 983(a)(3) is mandatory, it is not jurisdictional." *Id.* In reaching this conclusion, the court noted,

> it readily appears that the provisions of § 983 are procedural rules for pursuing the forfeiture of seized assets. The subject matter jurisdiction for forfeiture is conferred by 28 U.S.C. § 1355(a); the authority to forfeit is provided by 21 U.S.C. § 881(a)(6); and the rules of procedure for pursuing a civil forfeiture are provided by 18 U.S.C. § 983.

*Id.* at 795. The court further noted that § 983(a)(3)(A) allows courts to "extend the period for filing a complaint for good cause shown or upon the agreement of the parties," and stated that the possibility of an extension of time "undercuts any argument that the deadline is jurisdictional. Congress does not typically allow an agreement of the parties to define the scope of the district court's authority to hear a case." *Id.* Thus, the court concluded that "the provisions of § 983 are procedural rules for pursuing the forfeiture of seized assets," not "conditions of subject matter jurisdiction." *Id.*

The *Wilson* court relied on the decision of the United States Supreme Court in *Dolan v. United States*, 560 U.S. 605 (2010), where Justice Breyer, speaking for the Court, analyzed in detail the effect to be given different statutory "deadlines." 699 F.3d at 793. The statute under consideration in *Dolan* (the Mandatory Victims Restitution Act, 18 U.S.C. § 3664) provided that in sentencing "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." The 90-day

deadline passed, and the Supreme Court undertook to consider the consequences of the missed deadline where the statute does not specify the particular consequences.  In answering that question, Justice Breyer noted that the Court has looked to statutory language, the relevant context, and "to what they reveal about the purposes that a time limit is designed to serve." 560 U.S. at 610.  He considered first two possibilities:  whether the 90-day deadline in the case before the Court had a jurisdictional purpose or whether it was an ordinary claim-processing rule.  After rejecting those possibilities, he concluded that there was a third possibility which he held was applicable:  "a time-related directive that is legally enforceable but does not deprive a judge or *other public official* of the power to take the action to which the deadline applies if the deadline is missed."  *Id.* at 611 (emphasis added).

The analysis applied by Justice Breyer in *Dolan* requires rejection of the majority's position that the Government's failure to file a civil forfeiture action within 90 days of the Langbords' filing of a seized asset claim requires return of the Golden Eagles to the Langbords.  The first factor to which Justice Breyer looked was the statutory language. He noted that the use of the word "shall" in the statute's time-related directive has not, alone, "always led this Court to interpret statutes to bar judges *(or other officials)* from taking the action to which a missed statutory deadline refers."  *Id.* (emphasis added).  Similarly, the use of the word "shall" in § 983(a)(3)(A) ("Not later than 90 days after a claim has been filed, the Government *shall* file a complaint for forfeiture . . . . " (emphasis added)) is not dispositive here.  As Justice Breyer explained, the statute's "main substantive objectives" control.  *Id.* at 613.  In *Dolan*, the statute at issue was meant

7

to "help victims of a crime secure prompt restitution rather than to provide defendants with certainty as to the amount of their liability." *Id.* Applying similar reasoning, we see that CAFRA's purpose is not to deprive the Government of its property, but rather to determine the rightful owner of the property. As stated in the House Report introducing CAFRA,

> H.R. 1965 [CAFRA] is designed to make federal civil forfeiture procedures fair for property owners—to give innocent property owners the means to recover their property and make themselves whole. H.R. 1965 is not designed to emasculate federal civil forfeiture efforts. To the contrary, by making civil forfeiture fairer, this Committee is prepared to (and H.R. 1965 does) expand the reach of civil forfeiture and make it an even stronger law enforcement tool.

H.R. Rep. No. 105-358(I), at 27 (1997). Therefore, as in *Dolan*, I disagree with reading the word "shall" in the statute to deprive the Government of the opportunity to pursue its property claim.

The effect of a missed statutory deadline does not require the Government to lose its opportunity to provide the proceedings that were missed, as noted in cases from the Supreme Court, the other courts of appeals and the district courts. As explained in its comprehensive analysis, the

Fourth Circuit classified the 90-day "deadline" in another forfeiture statute as a "time-related directive," one even more forgiving than a "claims processing rule." *United States v. Martin*, 662 F.3d 301, 308 (4th Cir. 2011). The majority continually stresses that CAFRA "requires" the Government to file a civil forfeiture action. Here again, the *Dolan* opinion and its progeny show that the majority is wrong.

In *Dolan*, the Court was concerned about the possible harm to the victim from the missed deadline. In this case, the majority hypothesizes no harm to the Langbords. Although the majority does not point us to a single way in which the Langbords were harmed, it argues that they were prejudiced by the Government's "undue delay." The District Court addressed the issue of delay in the context of the Langbords' objection to the Government's filing of its declaratory judgment claim. Judge Davis denied the Langbords' objection, stating, "Permitting the United States to now bring its desired . . . declaratory judgment count[] neither introduces new factual issues nor revives irrelevant disputes. In short, [the Langbords] will occupy no worse a position than had the Government brought this counterclaim when answering the 2006 complaint." App. at 125-26. I agree.

The majority also presses its case against the Government for its alleged failure to comply with § 983 requiring notice of its seizure within 60 days. I note that the Langbords were aware from the very beginning of the matter of the Government's position as to the Golden Eagles. Shortly after the Langbords' counsel presented the coins to the Mint for authentication and sought $40 million for them

from the Government, App. 144[2], the Government's counsel sent him a written memorandum advising that the coins were government property and "that the U. S. Mint has no intention of seeking forfeiture of [them]."  App. at 143-44.  Thus, the Langbords were on notice of the Government's chosen course of action well within the statute's 60-day notice requirement, and therefore suffered no prejudice from lack of notice.

In *Dolan*, the Court stated that the party normally can mitigate any harm that a missed deadline might cause by simply telling the court or setting a timely hearing, which is what happened in this case.  *See* 560 U.S. at 615-16.  When the Langbords raised the absence of a hearing Judge Davis ordered one.  There are numerous cases, including those in the Supreme Court, the other circuits, and the district courts, that applied the same approach.  *Id.* at 611 (finding a court's violation of the statutory timeframe to sentence a defendant to be a mere "time-related directive" that is legally enforceable but ultimately does not deprive the court of power to determine the substantive issue); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171-172 (2003) (missed deadline for assigning industry retiree benefits does not prevent later award of benefits); *Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998) (even though Government missed the statutory deadline to file a report with Congress by approximately five years, the "failure to meet the deadline . . . . does not mean that [the] official lacked power to act beyond it"); *United States v. Montalvo–Murillo*, 495 U.S. 711, 722 (1990) (missed statutory deadline for holding bail detention hearing does not require judge to release defendant); *Brock v. Pierce*

---

[2]    Later, the Langbords lowered their claim to $7 or $8 million.

*Cnty.*, 476 U.S. 253, 266 (1986) (missed statutory deadline for making final determination as to misuse of federal grant funds does not prevent later recovery of funds); *United States v. Williams*, 720 F.3d 674, 702 (8th Cir. 2013), *cert. denied*, 134 S. Ct. 1337 (2014) (failing to follow criminal forfeiture procedures at trial does not relinquish the district court's ability to order post-conviction forfeiture); *Martin*, 662 F.3d at 308-09 (deadline for the district court to enter a criminal forfeiture order is a "time-related directive" and thus missing the deadline did not strip district court of the power to enter forfeiture orders); *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 198 (3d Cir. 2010) (Government was not precluded from taking action when it imposed sanctions on an employer eighteen months after the statutory limitations period expired); *Shenango Inc. v. Apfel*, 307 F.3d 174, 196-97 (3d Cir. 2002) (affirming that Government could assign benefits to employees under the Coal Act even after end of the statutory deadline for such assignment because the statutory timeframe was not meant to strip the Government of power to act beyond the deadline); *Sw. Pa. Growth Alliance v. Browner,* 121 F.3d 106, 113–115 (3d Cir. 1997) (denying petition to review the Environmental Protection Agency's ruling even though the ruling occurred outside the statutory timeframe because the statutory timeframe does not divest the agency of jurisdiction to act); *Marshall Durbin Food Corp. v. Interstate Commerce Comm'n*, 959 F.2d 915, 919 (11th Cir. 1992) (Interstate Commerce Commission's ("ICC") failure to review Administrative Law Judge's ("ALJ") preliminary decision within mandatory review period did not divest ICC of authority to reverse ALJ decision); *Lowell Consortium v. U.S. Dep't of Labor*, 893 F.2d 432, 433 n.3 (1st Cir. 1990) (allowing agency to recover funds almost five years after 120-day mandatory period had expired); *City of Camden v. U.S.*

*Dep't of Labor,* 831 F.2d 449, 451 (3d Cir. 1987) (allowing agency to recover funds six years after 120-day mandatory period had expired); *St. Regis Mohawk Tribe, N.Y. v. Brock*, 769 F.2d 37, 46 (2d Cir. 1985) (Government's failure to comply with the 120-day time limit for directing repayment of misspent federal grant funds did not bar Government from making the determination as it would "sacrifice[e] the public interest because of the negligence of public officers"); *Balt. & Ohio Chi. Terminal R.R. v. United States,* 583 F.2d 678, 690 (3d Cir. 1978), *cert. denied,* 440 U.S. 968 (1979) (because the Interstate Commerce Act "contains no express sanction for noncompliance" with the statutory deadline, belated agency proceedings need not be dismissed); *Usery v. Whitin Mach. Works, Inc.,* 554 F.2d 498, 501 (1st Cir. 1977) (under the Trade Act of 1974, the Government may determine an employee's eligibility for economic assistance even if the determination is outside the 60-day statutory limit).

The majority disparages my dissent's use of what it calls "easily distinguishable cases" that do not involve § 983(a)(3).  See Maj. Op. at 28 n.19.  The numerous cases cited in the dissent are hardly "easily distinguishable."  They involve forfeiture, as does CAFRA.  It was my understanding that appellate opinions frequently apply reasoning from similar, albeit different statutes, to make a point.  The majority apparently requires one-on-one identity with the statute under consideration.  The majority apparently feels free to censure a mere colleague's use of analogous precedent, but it apparently doesn't notice or recognize application of the same approach by a member of the Supreme Court of the United States.  For example, Justice Breyer, in *Dolan,* uses as precedent for the Court's analysis of the Mandatory Restitution Act what the majority would

regards as "easily distinguishable" statutes.  *See Dolan*, 360 U.S at 612 (citing *Montalvo-Murillo*, 495 U.S. at 718-19 (interpreting Bail Reform Act of 1984); *Brock*, 476 U.S. at 262 (interpreting Comprehensive Employment Training Act); *Barnhart*, 537 U.S. at 158-63 (interpreting Coal Industry Retiree Health Benefit Act of 1992); *Regions Hosp.*, 522 U.S. at 459 n.3 (interpreting Medicare Act)).

It stands to reason, then, that the proper remedy for a failure to follow CAFRA's notice or filing timeframes is to order the Government to comply with the statute, and many courts have so held.  For example, in *DeSaro v. United States*, No. 06-cv-20531 (S.D. Fla. Aug. 8, 2006), after the 11th Circuit had remanded the individual's CAFRA claim against the Government for its seizure and four year retention of two oil paintings without filing a forfeiture suit and without providing the required 60 day notice in criminal actions, the district court held that because the ownership and forfeitability of the paintings had been the subject of litigation almost since they were seized, the "requirement to bring a timely forfeiture action is therefore tolled."  *Id.*; *see also Garcia v. Meza,* 235 F.3d 287, 292 (7th Cir. 2000) (ordering Government to either return the property or institute judicial forfeiture proceedings after Government's original attempt at notice was deemed not to have afforded due process); *United States v. Giraldo*, 45 F.3d 509, 512 (1st Cir. 1995) ("If the notice turns out to have been [constitutionally] inadequate, the forfeiture is void.  The district court then must set aside the declaration of forfeiture and order the Customs Service to return the money to Giraldo or begin judicial forfeiture proceedings in the district court."); *Lopez v. United States,* 863 F. Supp. 2d 127, 130 (D. Mass. 2012) ("When a district court concludes that procedural deficiencies render an

13

administrative forfeiture void, it must order the agency to return the seized property or begin judicial forfeiture proceedings."); *United States v. $114,143.00 in U.S. Currency Seized from Michael J. Callash's Vehicle*, 609 F. Supp. 2d 1321, 1322-23 (S.D. Fla. 2009) (ordering Government to file a forfeiture complaint after the Drug Enforcement Administration improperly rejected a seized asset claim, where the claimant was aware within the notice period that Government had commenced administrative forfeiture proceedings, and noting that "the interests of justice are best served here . . . by allowing the parties to resolve [the forfeiture claim] on the merits" (alterations in original; internal citations omitted)).

The majority focuses exclusively on the "return of the Golden Eagles."  It does not challenge the District Court's decision that the Government's institution of a civil forfeiture proceeding would be an adequate remedy.  In so ruling, the District Court stated that "[the Langbords] concede that return is not required if the Government promptly initiates a judicial forfeiture proceeding."  App. at 157 (citing Plaintiffs' Motion for Summary Judgment, Due Process & Illegal Seizure).  The Court continued, "it is well established that 'illegal seizure of property does not immunize it from forfeiture as long as the [G]overnment can sustain the forfeiture claim with independent evidence.'"  *Id.* (citing *United States v. Pierre*, 484 F.3d 75, 87 (1st Cir. 2007); *United States v. 47 West 644 Route 38*, 190 F.3d 781, 782 (7th Cir. 1999)).  The majority never explains why the ten day forfeiture trial presided over by Judge Davis, "at which time the [Langbords could] raise whatever defenses [were] available to them," did not provide an adequate remedy.  App. at 165 (citing *United States v. Von*

14

*Neumann*, 474 U.S. 242, 251 (1983); *Garcia v. Meza*, 235 F.3d 287, 292 (7th Cir. 2000); *Giraldo*, 45 F.3d at 512).

As to the adequacy of the remedy ordered I note the Ninth Circuit's comments in *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006 (9th Cir. 2013), another CAFRA case where the Government was directed to send notice after missing the statutory deadline. The court asked, "is the [G]overnment required to return the property even if it has in the meantime commenced forfeiture proceedings?" *Id.* at 1016. In that case, by the time the issue was raised before the district court, the forfeiture proceeding was underway. The Ninth Circuit responded to its own question: "requiring the return of the property and then permitting the [G]overnment to immediately re-seize it would impose a meaningless exercise." *Id.*; *see also United States v. $114,031.00 in U.S. Currency*, No. 06-CIV-21820, 2007 WL 2904154, at *3 (S.D. Fla. Oct. 4, 2007); *Salmo v. United States*, No. 06-12909, 2006 WL 2975503, at *3 (E.D. Mich. Oct. 17, 2006); *Manjarrez v. U.S. Dep't of the Treasury*, Nos. 01 C 7530 & 01 C 9495, 2002 WL 31870533, at *2 (N.D. Ill. Dec. 19, 2002).

That leads to one of my principal bases for diverging from the majority: it does not acknowledge that a forfeiture proceeding did in fact take place and simply omits to mention the result of that proceeding. It is indeed baffling that the majority, which fervently asserts that a forfeiture proceeding should have taken place earlier (precise date never listed), disregards the result of the forfeiture proceeding when it did take place. After a ten-day trial before Judge Davis, the jury found "in favor of the United States on Count [I]

(forfeiture)"—a verdict the District Court found was fully supported by the evidence.  App. at 59.

In its post-trial findings, the District Court laid out the substantial evidence the Government presented at trial in support of its case.  The District Court reviewed the Government's evidence of the movements of all 445,500 1933 Double Eagles that were minted as presented through its expert, David Tripp's, testimony about the Mint's "meticulous," "exquisitely detailed" records.  App. at 9-11. The Court noted that "Tripp accounted for each and every one of the 445,500 1933 Double Eagles, and showed that *not a single '33 Double Eagle was issued to the public.*"  App. at 12.  The Court noted that the "first 'bank holiday' forbidding the payout of gold coins took effect on March 6[, 1933],  nine (9) days before the first shipment of '33 Double Eagles to the Philadelphia Mint cashier."  *Id.*  On June 27, 1933, 445,000 of the coins were sealed in a basement vault at the Mint.  *Id.* "The remaining 500 coins were in the cashier's control at one point or another."  *Id.*  After 29 coins were destroyed and 437 were returned to the Mint's basement vaults, the cashier was left with 34 coins.  *Id.*  The records reflect that all 34 coins that remained with the cashier "were moved to a basement vault on February 2, 1934."  *Id.* at 12-13.  The Mint sent two coins to the Smithsonian in October of 1934.  *Id.* at 13.

> [T]he Mints were authorized to begin melting their general stock of gold coins as of August 4, 1934.  That included, of course, the '33 Double Eagles held in the Philadelphia Mint's vault.  The Mints started melting gold shortly

> thereafter, and the entire process took about two-and-a-half years to complete. Because Tripp could account for all of the '33 Double Eagles and none were ever authorized for release, Tripp concluded that no '33 Double Eagles—including the coins in this case—could have been obtained through legitimate means.

*Id.* at 13-14.

The District Court found, relying on Tripp's testimony, that "[t]he jury saw no record of a legitimate '33 Double Eagle release, and from this lack of documentation one may reasonably infer that the responsible party appropriated the coins in secret, knowing full well the wrongfulness and illegality of his actions." App. at 35. Furthermore, despite Switt's own testimony, in earlier proceedings, that he never obtained any gold coin from the Philadelphia Mint, Switt and McCann's[3] bank accounts evidence thousands of dollars of deposits to McCann's bank accounts that emanated from an account Switt controlled. And, "the Secret Service determined that McCann was the likely inside source of the '33 Double Eagles; as Mint cashier, McCann had the opportunity to abscond with the coins, and McCann's conviction for stealing other coins from the Mint shows that

---

[3] Recall that Switt was the source of the Langbords' coins and McCann was the cashier at the Philadelphia U.S. Mint during the relevant period.

he knew how to pull it off." App. at 36. After a lengthy
investigation, the Secret Service could not identify any 1933
Double Eagle that left the Mint other than coins traced to the
possession of Israel Switt.

As to the Langbords' knowledge, the Government
presented evidence that in 2002, after reading a New York
Times article about the Fenton 1933 Double Eagle (which
mentioned Switt), Roy Langbord called Joan Langbord to ask
if Switt (his grandfather) had kept any more of the coins.
Joan Langbord admitted to looking into the safe deposit box
that contained the Double Eagles many times over the years,
including the day before the Fenton coin was auctioned, but
maintained that she knew nothing about the coins until she
discovered them at the bottom of the same safe deposit box in
2003. As the District Court noted,

> the evidence supports an inference
> that Joan Langbord knew her
> father had stolen the coins and
> hidden them in the family's safe
> deposit box; she found the coins
> well before the Fenton '33 Double
> Eagle went up for auction and
> continued to conceal them; her
> son Roy also knew of the
> questionable provenance of [the]
> 1933 Double Eagles, at least after
> reading the New York Times
> piece in 2002; and the Langbords
> decided to reveal the coins to the
> Government only after learning of
> their immense monetary value,

> hoping to cash-in like Stephen
> Fenton did.

*Id.* at 37. Thus, substantial evidence supports the jury's verdict and the District Court's declaratory judgment that the coins left the Mint illegally, that Switt was involved, that his relatives knew that the coins' acquisition was illegal and continued to conceal them, and thus, that the coins should be forfeited. None of the evidence discussed above relies upon the Secret Service reports, the admissibility of which, as the majority references, was contested on appeal on hearsay grounds[4].

On Count II (declaratory judgment), the District Court declared:

> The disputed Double Eagles were
> not lawfully removed from the
> United States Mint and
> accordingly, as a matter of law,
> they remain the property of the
> United States, regardless of (1)
> the applicability of CAFRA to
> the disputed Double Eagles, (2)
> Claimants' state of mind with
> respect to the coins, or (3) how

---

[4] The majority states that it does not reach the hearsay-within-hearsay rule, *see* Maj. Op. at 10 n.5, but it then proceeds to reach it. I will not reach that issue because, as set forth in the text, there is ample evidence to support the jury's verdict without relying on the Secret Service reports.

19

the   coins   came   into   the
Claimants' possession.

App. at 5.

Though   the   majority's   entire   objection   to   the
Government's   position   in   this   case   stems   from   the
Government's failure to file a forfeiture suit, and its failure to
do so within the 90-day period that CAFRA fixes for that
action, the majority gives no credit to the result of the
judgment.

Finally, I believe Congress would be incredulous if
this court were to hold that the Langbords should be given the
Golden Eagles for which they originally sought $40 million
because a federal lawyer did not file a forfeiture complaint
within 90 days of the applicants filing a seized asset claim,
notwithstanding the decision of two triers of fact that the
Golden Eagles at issue belonged to the United States.

II

The majority rejects the Government's position (and
the District Court's conclusion) that the Government never
instituted administrative forfeiture proceedings in this case
because it never sent notice of its intent to forfeit the coins.
The majority reasons, in part, that notice cannot possibly be
the triggering event for CAFRA's timeframes because, it
believes, the forfeiture statutes require notice in "*some*, but
not all, nonjudicial civil forfeiture proceedings." Maj. Op. at
17-18.   I cannot agree with this reading of the forfeiture
statutes.  Section 1607 merely exempts "vessel[s], vehicle[s],
aircraft, [and] merchandise" worth over $500,000 from the
administrative forfeiture process altogether, meaning that for

20

such objects, the Government would have to resort to judicial forfeiture.  *See* Stefan D. Cassella, *Asset Forfeiture Law in the United States* 154-55 (2d ed. 2013).  Objects not covered by § 1607 are addressed in a later statutory section:

> If any vessel, vehicle, aircraft, merchandise, or baggage is not subject to section 1607 of this title, the appropriate customs officer shall transmit a report of the case, with the names of available witnesses, to the United States attorney for the district in which the seizure was made for the institution of the proper proceedings for the condemnation of such property.

19 U.S.C. § 1610.  Thus, rather than sending notice to interested parties as for an administrative forfeiture, seized property not subject to § 1607 is referred to the U.S. Attorney for judicial forfeiture proceedings.  *See Malladi Drugs & Pharm., Ltd. v. Tandy*, 552 F.3d 855, 887 (D.C. Cir. 2009) ("Under the customs laws, the DEA may forfeit seized goods valued at more than $500,000 only upon a judicial decree after judicial forfeiture proceedings, 19 U.S.C. § 1610, but may administratively forfeit goods valued at or less than $500,000.").  The reason for this is that "forfeitures involving more valuable property must be processed through the judicial system."  135 *Cong. Rec.*, S12622-01 (daily ed. Oct. 4, 1989) (Statement of Sen. Joseph Biden).  However, as the majority recognizes, the Double Eagles are monetary instruments which do not fall under the $500,000 threshold of

21

§ 1607(a)(1) and for which administrative forfeiture is allowed. *See* 19 U.S.C. § 1607(a)(4).

Furthermore, the majority's contention that § 983(e)(1) ("[a]ny person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person's interest in the property") contemplates administrative forfeitures beginning without notice being sent, *see* Maj. Op. at 20-21, disregards the fact that the Government often seizes property and does not know all of the parties that may have an interest in the property. The notice provision requires the Government both to send notice "to each party who appears to have an interest in the seized article" and to publish notice in the newspaper for this very reason. 19 U.S.C. § 1607(a). Cassella explains that the Government must generally send notice to "the person from whom the property was seized, the titled owner of the property, lienholders, and any other person known to the Government to have an interest." Cassella, *supra*, at 175. Section 983 specifically provides for situations in which "the identity or interest of a party is not determined until after the seizure or turnover but is determined before a declaration of forfeiture." 18 U.S.C. § 983(a)(1)(A)(v). Thus, I read § 983(e)'s discussion of a party "who does not receive such notice" to contemplate instances in which a person has an interest in seized property, but to whom the Government does not send notice because it does not know that person's identity—not because it has no obligation to contact that person. Indeed, § 983(e) allows such persons to set aside forfeiture where "(A) the Government knew, or reasonably should have known, of the moving party's interest and failed to take reasonable steps to provide such party with

22

notice; and (B) the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim." *Id.* § 983(e). Far from evidencing that an administrative forfeiture proceeding begins before notice is given, § 983(e) reinforces the notion that notice is required to institute administrative forfeiture.

## III

The majority questions whether the District Court had the authority to issue a declaratory judgment in a CAFRA case. Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Rule 57 provides, "The existence of another adequate remedy does not preclude a declaratory judgment." Fed. R. Civ. P. 57. The District Court entered declaratory judgment for the Government, ruling that the "Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States . . . ." App. at 5.

The majority vacates the declaratory judgment on a basis no court has accepted.

The Advisory Committee notes to Rule 57 state, "A declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings." *Id.* (1937 Advisory

Committee notes); *see also Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (declaratory relief "should not be granted where a special statutory proceeding has been provided"). The majority holds that CAFRA is a "special statutory proceeding" under Rule 57.

> However, since the enactment of the Declaratory Judgment Act, only a handful of categories of cases have been recognized as "special statutory proceedings" for purposes of the Advisory Committee's Note. These include: (i) petitions for habeas corpus and motions to vacate criminal sentences; (ii) proceedings under the Civil Rights Act of 1964; and (iii) certain administrative proceedings.

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006) (internal citations omitted). The parties do not direct us to, nor could I find, any case finding forfeiture statutes to preclude declaratory judgment, and the majority's interest in being the first court to so hold is questionable.

In support of its argument that CAFRA fits as a "special statutory proceeding," the majority, noting the inclusion of the Civil Rights Act of 1964 within that rare group of statutes that have been held to fit within that category, compares CAFRA with the Civil Rights Act of 1964. Maj. Op. at 32. That such a comparison could be

issued in an opinion of the Third Circuit which has a
distinguished history in support of civil rights, whatever the
context, shocks my conscience.  I can attribute it only to the
desperation of its position.

Moreover, as the District Court noted, even where a
statute provides for "special statutory proceedings" that
would normally preclude declaratory judgment, a declaratory
remedy may still be necessary.  *See* App. at 64.  The District
Court reasoned, "even if CAFRA did typically provide a
special statutory remedy, it does not do so in this case."  *Id*.
The Court considered the Government to be playing a dual
role in this action:  as a representative of the people of the
United States seeking forfeiture of the proceeds of an alleged
crime, and as the property owner seeking to reestablish legal
title to the coins.  CAFRA's remedies could accomplish the
forfeiture, but could not establish the property interest the
Government sought to vindicate.  Therefore, the Court
determined that the Government could pursue declaratory
relief.  The numerous district courts throughout the county
who hear CAFRA cases will be surprised to read that the
Third Circuit has deprived them of a tool they have used as a
matter of course.  Why?  Is the majority so eager to go down
in history as the first court to scuttle a useful procedure?

In responding to the Government's requested
declaration that the disputed Double Eagles were not lawfully
removed from the United States Mint and accordingly remain
the property of the United States, the Langbords argued that
the declaration "would impermissibly interfere with the
province or the jury."  App. at 57.  The District Court noted,
"Since the Government won on the forfeiture claim, the jury
must have found the coins were 'not lawfully removed' from

the Mint." *Id.* It then noted, "The principle of jury supremacy binds us to that finding." *Id.* (citing *Roebuck v. Drexel Univ.*, 852 F.2d 715, 717 (3d Cir. 1988)). That principle also binds my colleagues as it did the District Judge, who also stated it made it "unnecessary [for the District Court] to conduct any additional fact finding to resolve the Government's declaratory judgment claim." *Id.*

## IV

A careful review of the provisions of CAFRA, its legislative history, and the cases that have interpreted it reveals that the purpose of the statute, its notices, and its detailed

procedures, is to allow those claiming an interest in potentially forfeitable property to have the merits of their case heard by a fact finder, who will reach a fair determination as to which party among those who lay claim on the subject in dispute is entitled to the subject. It is that ultimate issue that counts, which party is entitled to the property, even if the time taken to reach that decision has been significant. This case presented several difficult and complex issues for the District Court to resolve. In a series of particularly well-reasoned opinions, the District Court handled these issues thoroughly and thoughtfully, and I would affirm. I believe the majority misreads the statute, the relevant precedent, and Congress' intent.

**CERTIFICATE OF SERVICE**

I hereby certify that this pleading has been served on the Filing Users

identified below through the Electronic Case Filing (ECF) system:

> Barry H. Berke, Esq.
> Eric A. Tirschwell, Esq.
> Kramer Levin Naftalis & Frankel LLP
> 1177 Avenue of the Americas
> New York, NY 10036

> _/s Robert A. Zauzmer_
> ROBERT A. ZAUZMER
> Assistant United States Attorney

DATED: July 1, 2015.